

**NUMBER 13-14-00433-CV**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

### IN THE INTEREST OF S.S., A CHILD

**On appeal from the 267th District Court
of Victoria County, Texas.**

## DISSENTING MEMORANDUM OPINION

**Before Justices Benavides, Perkes, and Longoria
Dissenting Memorandum Opinion by Justice Benavides**

I agree with the majority that the trial court's statutory findings under section 161.001(1) of the family code are legally and factually sufficient and that the trial court's best interest finding under section 161.001(2) is legally sufficient. However, I disagree with the majority that the remaining best interest finding is factually sufficient. For this reason, I respectfully dissent.

The Texas Supreme Court has noted that parental termination proceedings encumber a value "far more precious than any property right" and are governed by "special rules." *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758 (1982)). In that same breath, we are faced not with the ordinary dispute about how to allocate money in a contract or tort action; but we must decide how to reconcile a parent's desire to raise her child with the State's responsibility to promote the child's best interest. *Id.* As such, the Department's burdens before removing a child from his parent are "significant" in order to protect a parent's "fundamental liberty interest in the companionship, care, custody, and management of her children." *See In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013); *see also Holick v. Smith,* 685 S.W.2d 18, 21 (Tex. 1985) (noting that "involuntary termination statutes are strictly construed in favor of the parent"). In addition to recognizing these "constitutional underpinnings of the parent-child relationship," "the emotional and physical interests of the child" are also essential and should "not be sacrificed merely to preserve that right." *In re E.C.R.*, 402 S.W.3d at 240 (citing *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

As recognized by the majority, in reviewing a trial court's best interest finding, courts consider, among other evidence, the non-exclusive *Holley* factors. *See In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of

the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* We must also, however, take into account other non-*Holley* considerations because of the impact of these types of proceedings. "[T]here is a strong presumption that the best interst of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

In this case, nothing in the record directly indicates S.S.'s desires. However, the Department's caseworker Alex testified that Mother has bonded with S.S. and that S.S. is "excited" to see Mother during their visits. Furthermore, CASA volunteer Walker offered similar testimony by stating that S.S. has developed a "trusting and loving" relationship with Mother, and Walker affirmed that while S.S. is "usually upset with strangers . . . he is completely content to enjoy time with [Mother]." Alex also testified that throughout this case, Mother has been consistent in her visits with S.S. and only missed her visits with S.S. when the foster family had scheduling conflicts. Finally, the Department presented no evidence that S.S. did not want to return to his Mother. As a result, I conclude that this factor weighs against termination.

Next, I examine factors two and three together. Caseworker Alex and CASA volunteer Walker both expressed concerns about Mother's ability to provide for S.S.'s emotional and physical needs now and in the future, as well as protect S.S. from physical and emotional dangers now and in the future. Alex testified that the Department had concerns regarding Mother's decision-making ability and life choices. Specifically, Alex pointed out that Mother had continued a relationship with Father, despite Z.M.'s near death, and also became pregnant with his second child. Alex noted that due to S.S.'s

3

young age, he is "pre-verbal" and "can't say much of anything." Because of his inability to speak, Alex testified that any future abuse or neglect might go unreported. In my opinion, this is entirely speculative. Walker also opined that S.S. would not be safe in Mother's care and was uncertain that Mother would keep S.S.'s future best interests in mind. To counter this testimony, Mother elicited testimony from court-ordered counselor, Wendy Holder, who testified that Mother has "progressed" throughout their sessions together. Holder also described Mother presently as a "responsible," "stable," and "resilient" person, who is capable of protecting S.S. in the future. Mother further testified that she was currently employed full-time by Caterpillar and earned $13.24 per hour. Mother also testified that she was not involved in a relationship with anyone at the time of trial. Additionally, the evidence shows that Mother has bonded with S.S., despite the present termination proceedings. I conclude that factor two weighs slightly against termination because of Mother's undisputed emotional bond with S.S., her full-time job, and progress in counseling sessions to provide for S.S.'s physical and emotional needs now and in the future. However, despite these facts, Mother's continued a relationship with Father, who has since pleaded guilty to aggravated assault of Z.M., and her pregnancy with his second child demonstrates a failure to protect S.S. from emotional and physical danger now and in the future. Accordingly, I weigh factor two slightly against termination, but factor three in favor of termination.

Next, I look to Mother's parenting abilities. The Department presented testimony from C.P., Mother's cousin, who labeled Mother as a "rough" parent. Additionally, the record also shows that Mother made poor past decisions by allowing S.S. to live in a home where drugs were present, and also ignored Father's severe physical abuse

4

committed against Z.M. Additionally, Mother attempted to conceal these facts to medical providers and the Department. However, Holder testified that Mother is "responsible" with a "strong support system in place." Furthermore, as outlined earlier, the Department indicated that Mother and S.S. presently share a bond with one another and that Mother has not shown the Department that she is unfocused or lacks love or affection for S.S. Thus, I conclude that this factor is neutral.

With regard to factors five, six, and seven, Mother indicated that she would like to continue attending counseling sessions. The record also shows that Mother has attended church "regularly," "faithfully," and "consistently" at the Iglesia de Jesus Church in Victoria. Elizabeth Flores, one of Mother's acquaintances from church, testified that she is aware of Mother's legal issues and that Mother began attending church services to "improv[e] herself" and has been involved in the church. Additionally, Mother testified that she lived with Maternal Grandmother, who is employed as a long-time special education aide for the Bay City Independent School District. Furthermore, aside from the minor breach of the safety plan at the San Antonio hospital on November 28, 2012, the Department had no concerns with Maternal Grandmother's ability to care for S.S. Therapist Holder also testified that Mother had a "very good support system" and that Holder does not release patients from counseling if they do not have a support system in place. Finally, the Department presented little evidence in its favor to support termination based on these factors. CASA volunteer Walker testified that S.S. has developed a relationship with Mother, and if Mother's parental rights were terminated, it would be "difficult" for S.S., but he would thrive in another environment. With regard to factors six and seven, the Department presented minimal evidence regarding placement options for S.S. As the

5

majority correctly points out, the record shows that a "positive home study" was conducted months prior to this proceeding for possible placement with Mother's cousin, C.P., but very few other details were provided about this possible placement option. C.P. testified that she currently lived with her husband, her oldest daughter, and her oldest daughter's three children. C.P. admitted that her oldest daughter had a prior history with the Department, but that if S.S. was placed in her custody, she would ask her daughter to leave the home. Maternal Grandmother testified that C.P. struggled with drugs in the past. Finally, Walker testified that her recommendation to the court was to terminate Mother's parental rights and grant the Department permanent managing conservatorship, while it continued to look for "possible adoption, kinship or non." I construe this testimony as reluctance on the part of CASA to recommend S.S.'s placement in C.P.'s custody. *See In re C.H.*, 89 S.W.3d at 28 ("Evidence about placement plans and adoption are, of course, relevant to best interest."). As a result, I conclude that factor five weighs against termination, and because few details were provided regarding factors six and seven, I weigh them neutral.

Next, I weigh Mother's acts or omissions which may indicate that the existing parent-child relationship is improper and any excuse for Mother's acts or omissions. As outlined by the majority, the Department presented sufficient clear and convincing evidence that Mother endangered S.S.'s physical and emotional well-being by allowing S.S. to be in a home where drugs were possessed and severe physical abuse took place and that Mother continued to endanger S.S. by allowing Father to supervise him alone, despite severely physically abusing his half-sibling, Z.M., to the point of near death. Additionally, the Department expressed concerns that Mother possibly knew about

Father's abuse of Z.M. at the time it took place. Because of this evidence, factor eight weighs in favor of termination. Furthermore, the Department presented evidence that Mother continued to demonstrate poor judgment by continuing a relationship with Father and becoming pregnant with his second child during the pendency of this case. Mother's counselor also admitted that such a decision demonstrates "poor judgment." However, Holder noted in her testimony that Mother learned that her relationship with Father was a "red flag" that she missed, and, as a result of counseling sessions, was able to "identify relationship issues with unhealthy versus healthy boundaries." Mother also testified that she now recognized that Father was "controlling" and, as a result of her counseling, she has recognized the "red flags" of her relationship with Father. The record also shows that Father pleaded guilty to aggravated assault and was sentenced to ten years' imprisonment for the injuries sustained by S.S. Although the evidence shows that Mother recognized the issues with Father and worked through those issues in counseling, the facts that she continued her relationship with him during the pendency of this case, became pregnant with his second son during the pendency of this case, and initially lied to the Department about the pregnancy, factor nine—any excuse of Mother's past acts or omissions—weighs in favor of termination.

Finally, I look to other non-*Holley* factors relevant to a best interest determination. The Department's witnesses testified that reunification was the Department's goal until charges were brought against Mother and when it discovered that Mother was pregnant with Father's child. At the time of trial, Mother had yet to dispose of her charges, and Father was sentenced to ten years' imprisonment for Z.M.'s injuries. I recognize that Mother continued an intimate relationship with Father, despite Father nearly causing the

7

death of her son, Z.M. However, despite Mother's admittedly bad decision-making with regard to her relationship with Father, I cannot ignore that Mother recognized and took responsibility for those decisions, successfully completed the child safety plan—including individual counseling and parenting courses—and underwent a successful drug and alcohol assessment. *See In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet denied) (noting that compliance with the Department's family service plan is one factor to consider in a best interest analysis). This evidence shows the seriousness of Mother's effort to change her life for S.S., as well as her commitment to the Department's initial stated goal of reunification. The Department presented minimal evidence, other than speculative and conclusory testimony, to refute these facts. For example, Alex testified that Mother's compliance with the safety plan was just used as a "checklist" without any showing that she wanted to change her past patterns of behavior. The law states, however, that the Department's allegations must be supported by clear and convincing evidence, and conjecture is not enough. *See In re E.N.C*, 384 S.W.3d at 810. With regard to this factor, the Department did not meet its burden. Accordingly, I conclude that this factor weighs against termination.

I join the majority's conclusion that the finding that termination of Mother's parental rights to S.S. was in his best interests is legally sufficient. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). However, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that terminating Mother's parental rights to S.S. was in his best interest. *See id.*

The evidence is undisputed that Mother and S.S. share an emotional bond in spite of the present proceedings; the Department does not assert that Mother's love for S.S. is

8

disingenuous or lacking; nor does the Department dispute that Mother has completed her service plan with the Department. The record also shows that Mother has also made poor decisions in the past with regard to her children, particularly by still maintaining a relationship with Father, despite his prior acts of abuse toward Z.M., and becoming pregnant with another child. However, Mother testified that she recognized her past faults and poor decisions, and her counselor has also noted that Mother made progress from those faults since beginning her counseling sessions. Mother has also successfully completed her family service plan with the Department. The record also shows that Mother is employed full-time, has built a relationship with her church, and lives with Maternal Grandmother, who is a special-needs educational aide. I recognize that "[o]ftentimes, past is prologue," *see In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.), but under the facts of this case, when weighed against each consideration relevant to S.S.'s best interest, I conclude that the Department has not met its heightened burden of proof that termination of Mother's parental rights to S.S. is in S.S.'s best interest. I would hold that S.S.'s physical and emotional interests would best be served by not terminating Mother's parental rights. *See In re E.C.R.*, 402 S.W.3d at 240. Accordingly, although the trial court's finding regarding S.S.'s best interest was legally sufficient, I would conclude that the trial court's best interest finding should be reversed for factually insufficiency and that the case be remanded for a new trial.

/s/GINA M. BENAVIDES
GINA BENAVIDES,
Justice

Delivered and filed the
15th day of January, 2015.

9