**Affirmed and Memorandum Opinion filed December 4, 2018.**



In The

# Fourteenth Court of Appeals

---

**NO. 14-18-00561-CV**
**NO. 14-18-00562-CV**
**NO. 14-18-00563-CV**

---

## IN THE INTEREST OF A.Z.C. AKA A.Z.H., L.D.C. AKA L.C., AND B.C. AKA B.B.H., CHILDREN

---

**On Appeal from the 257th District Court**
**Harris County, Texas**
**Trial Court Cause Nos. 2010-58803, 2016-60348, & 2016-78905**

---

### M E M O R A N D U M    O P I N I O N

Appellant L.M.H. (Mother) appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her children A.Z.H. (Andrea), L.D.C. (Leslie), and B.C. (Barry).[1] The trial court terminated Mother's rights to Andrea on the predicate

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minors and other individuals involved in this case.

grounds of endangerment. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D) & (E). (West. Supp. 2017). The trial court terminated Mother's rights to Leslie and Barry on the predicate grounds of endangerment and being the cause of the children being born addicted to alcohol or a controlled substance. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E) & (R). The trial court further found that termination of Mother's rights was in the children's best interest, and named the Department managing conservator of the children.

In two issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on section 161.001(b)(1)(D) and the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children. Because we conclude the evidence is sufficient to support the trial court's findings, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Pretrial Proceedings

#### A. Child Support Review Order

These cases began in 2010 with a Child Support Review Order establishing that Mother and R.G.C. (Father) were Andrea's parents. The order appointed both parents as joint managing conservators. Mother was designated the conservator who could determine the child's primary residence. The order also directed when each parent would have possession of the child.

#### B. 2014 Referral

Four years later the Department filed a motion to modify for conservatorship and termination of both parents' parental rights. By this time Leslie was ten months old. The removal affidavit noted that Andrea was exposed to drug use and domestic violence. Due to Mother's admitted use of cocaine and PCP, the Department asked

to be named temporary managing conservator of Andrea and Leslie.

When questioned by the Department investigator, Mother denied any history of alcohol or drug abuse. Mother denied use of alcohol or drugs at the time and denied any experience with domestic violence. Mother was unemployed and received government assistance for her and her children.

Mother submitted to a drug test during the investigation, which came back positive for PCP. After being confronted with the test results, Mother admitted prior PCP use but denied using drugs at home in front of her children.

The children were placed with a maternal aunt and Mother found a location where she could undergo drug education. Mother asked that the children be moved to their godmother, which was approved. Family Based Safety Services (FBSS) was engaged to monitor Mother's progress toward remaining drug and alcohol free. While being monitored by FBSS Mother continued to test positive for cocaine and PCP.

A family service plan was created and the trial court ordered Mother to comply with the plan to obtain the return of her children. Mother entered inpatient treatment for substance abuse but did not appear to understand the tasks she was required to complete. Mother thought that the children would be returned to her as soon as she was discharged from inpatient treatment. Mother was discharged from the first inpatient treatment facility because she took drugs with her to the facility. Mother attended a second treatment facility for three months. Following discharge from the second facility Mother was asked to participate in outpatient treatment and random drug testing. Mother tested positive for drugs after discharge.

The Department initiated protective custody of Andrea and Leslie, and was named temporary managing conservator.

**B.     2016 Referral**

When Barry was born on November 9, 2016, the Department received a referral of neglectful supervision due to the active Department case involving Andrea and Leslie and Mother's "ongoing use of illicit drugs." When Mother gave birth, she tested positive for cocaine, PCP, benzodiazepines and amphetamine. Barry, who was born at 34 weeks' gestation, tested positive for PCP and cocaine at birth.

Mother told the Department investigator that she regretted using drugs while pregnant and wanted to seek inpatient treatment at a facility that would allow Barry to accompany her. Barry's neonatal nurse informed the investigator that due to Barry's premature birth he could not go with Mother because he needed stay in the hospital at least one week. The Department sought temporary managing conservatorship of Barry.

**D.     Department History**

On December 28, 2010, when Andrea was eight months old, the Department received a referral noting that the baby was "at risk when with her father." The case was ruled, "unable to determine."

On May 27, 2012, the Department received another referral for neglectful supervision in which it was alleged that Father sold drugs out of the home and abused drugs. The referral also noted that Mother and another non-relative had been seen using drugs around the child. The case was "ruled out."

**E.     Criminal History**

Mother pleaded guilty in 2010 to public intoxication and served an indeterminate sentence. Mother pleaded guilty in 2011 to prostitution and was sentenced to six  days' confinement in the Harris County Jail.

**F.    Temporary Orders and Family Service Plan**

In all three cases the trial court entered temporary orders suspending visitation until the "parents have a clean drug test," and ordering both parents to comply with each requirement set out in the Department's family service plan. Mother's plan first noted that the older children came into care because neighbors had seen Andrea and Leslie appearing dirty and hungry. The report further noted that Mother received food stamps for her children but would sell the food stamps rather than buy food for her children. All three children were considered to be vulnerable and unable to protect themselves from abuse or neglect.

Mother's family service plan required her to complete the following tasks:

- participate in an intensive outpatient substance abuse treatment program for 45 days, which includes three groups per week at three hours per group with one individual session per week at one hour per individual session;

- participate in a supportive outpatient 90-day substance abuse treatment program, which includes two groups per week at three hours per group with two individual sessions per month at one hour per session;

- participate in person in Department-approved parenting classes of six to eight weeks in length;

- provide the Department caseworker with a release of information for all service providers, medical personnel, and officers of the court to obtain records and progress information;

- maintain contact with the current Department caseworker giving truthful information, attending all meetings, court hearings, visitations, and other planning sessions regarding her children;

- refrain from criminal activity;

- participate in twelve-step meetings and a twelve-step program throughout the case;

- remain free from all mind-altering substances including alcohol and drugs, sobriety to be monitored by participating in random

5

drug testing with the understanding that a failure to report will be treated as a positive test;

- participate in a substance abuse assessment and follow all recommendations;

- maintain stable, sanitary housing and legally verifiable employment;

- participate in a psychosocial evaluation and follow all recommendations; and

- participate in a psychiatric assessment and follow all recommendations.

## III. Trial

### A. Mother

Stacy Ellison, a substance abuse counselor with Star of Hope, was Mother's counselor in an intensive residential program for women who are trying to maintain their sobriety. At the time of trial Mother had been in the 90-day program for approximately six weeks. The Star of Hope was building apartments where Mother could live with her children if they were returned to her. Since being in the program Mother passed every drug test. Ellison testified that Mother had a plan after discharge for employment at a fast food restaurant and daycare for her children.

Mother testified that she took full responsibility for her children's removal. Mother completed a 90-day drug treatment program at Santa Maria before going to the Star of Hope. Mother had not seen her two oldest children for two years, and had not seen her youngest child since his birth. Mother completed all services. Mother testified that she had not used drugs since entering treatment in the Star of Hope program. Mother admitted missing some of the pretrial hearings in the case stating that she was still "in [her] addiction."

Mother testified about attending inpatient treatment at Volunteers of America

6

and Santa Maria Hostel. Mother was unsuccessfully discharged from Santa Maria and began using drugs again. Approximately three months after leaving Santa Maria, Mother entered the Volunteers of America inpatient program. Mother relapsed one month after leaving Volunteers of America. Mother also stopped taking prescribed medication after leaving Volunteers of America. Mother testified that at the Star of Hope program she became more dedicated to remaining sober and was receiving medication to address her mental health issues. Mother learned that her triggers are seeing other people with their children, and associating with people who use drugs and alcohol. Mother learned how to deal with her triggers through twelve-step meetings and working with recovery coaches. Mother has filled out an application for an apartment to move into after leaving treatment and has three job placements for when she leaves the program. Mother also plans to be trained as a nursing assistant.

Both court-appointed Child Advocates met with Mother while the case was pending, and Mother was pregnant with another child. Mother admitted PCP use a week before the advocates met with her.

Ashley Edwards, the caseworker for all three children, testified that both parents had been given family service plans, which were made orders of the court. With regard to Mother's plan, she had completed a substance abuse assessment, attended parenting classes, refrained from criminal activity, and attended twelve-step meetings. These tasks were in addition to Mother's inpatient substance abuse treatment, which she was receiving at the time of trial.

While crediting Mother's progress toward sobriety, Edwards testified that the Department was not able to return the children to Mother because she had not demonstrated the ability to provide a stable home. Edwards emphasized that the two youngest children were born dependent on drugs and needed six to seven months to

7

withdraw. The youngest child was still experiencing physical withdrawal symptoms at the time of trial.

Dr. Akalita Ross conducted a psychological examination of Mother, which included a parenting assessment. The assessment was based on the Adult-Adolescent Parenting Inventory, described as an inventory designed to assess the parenting and child-rearing attitudes of adult and adolescent parent populations. The assessment consisted of 40 questions relating to parenting techniques, thoughts about how a child should act toward the parent and how a parent should act toward a child. Ross's assessment indicated:

> [Mother] is at High Risk for appropriate expectations of children. She may lack an understanding of normal child growth and development, and her self-concept as a parent may be weak and easily threatened. This suggests that she may expect children to achieve at a higher level than they are capable often display a sense of self-inadequacy and perceived inadequacy as a caregiver. She is at High Risk for low empathic awareness of her children's needs. [Mother] may fear spoiling her children along with having difficulties understanding children's normal development and value. She may expect children to be [sic] act right and be good. [Mother] is at Medium Risk stern score for corporal punishment. This may indicate that hitting is the only way children learn to obey rules and stay out of trouble. Many people believe that fear, pain, or belittlement are necessary for children to fear their parents which results in greater compliance. [Mother] [l]acks knowledge of alternatives to corporal punishment. [Mother] is at Medium Risk of parent-child family roles which may perceived [sic] children as objects for adult gratification, and may tend to treat children as confidant and peer. She may also expect children to make life better by providing love, assurance, and comfort. Furthermore, the results indicate she is at High Risk of oppressing children's power and independence. This may indicate that children are expected to be obedient to demands, views independent thinking as disrespectful and views children with power as threatening.

As a result of the assessment, Ross recommended Mother participate in parenting

classes, obtain substance abuse treatment, and attend therapy for depressive symptomology in her relationship with her children.

Ross testified that Mother was in the high-risk category with regard to empathy toward children's needs. Ross explained that this determination meant that Mother does not understand the children's emotional and physical needs. Mother was also at risk in the "power and independence" category, which describes a parent's feeling that they have complete power over a child, and not understanding a child's level of independence. This attitude can detrimentally affect children's emotional growth. Mother scored as medium risk in the corporal punishment category, which means that Mother generally sees corporal punishment as the primary method of discipline. Corporal punishment can have a negative effect on children, especially if it is done when a parent is angry or upset and there has not been time to process emotion or explain to the child the reason for the discipline. Mother lacked knowledge of alternatives to corporal punishment. Ross testified that her findings with regard to Mother's parenting were concerning because, at the time, Mother had attended parenting classes where she should have learned new skill sets, which should have improved her scores. Ross testified that if Mother were named primary caregiver of the children it would put the children at risk.

Ross also conducted psychological testing, which led to diagnoses for major depression disorder as well as stimulant use disorder. Ross recommended individual therapy, parenting classes, ongoing substance abuse programs, and an outpatient program upon completion of an inpatient program.

Mother testified that her parenting classes taught her how to be a nurturing parent, how to discipline her children in an appropriate manner, and how to show affection to her children building up their self-confidence. Mother also learned how to teach her children to handle stressful situations and cook nutritious food.

9

## B.     Children

Robin Noser, the Child Advocates' volunteer, testified that the children were thriving. Andrea, seven, and Leslie, four, were still behind in school and had behavioral problems but were improving. Barry, who was 18 months old, was a "happy baby who loves to look at books and play peek-a-boo." Although the older children were improving in school they had significant behavior and academic challenges that Mother did not have the skills to address.

All four children live in the same foster home.[2] The foster home was stable and, in Noser's opinion, was Andrea's and Leslie's best chance to have "a normal childhood." The girls were able to ride their bikes and play with other children in the neighborhood. The foster mother was at home when the girls arrived home from school; the foster mother took the girls to church, and the children call her "mom."

Barry was born with symptoms of drug withdrawal, including shakes, inability to track with his eyes, inability to produce tears, and hearing loss. Barry was removed at birth and taken directly to the foster home. By the time Barry was six or seven months old the shakes stopped, and his hearing was normal. Barry had successful surgery on his eyes. At 18 months Barry did not require additional care. Noser recommended that Barry remain in the foster home. Barry was well-adjusted and happy in the foster home, which is the only home he knows. Barry had no delays in development. Noser had not seen any evidence that Mother could provide a safe and stable home for Barry.

Linda Hernandez was the court-appointed Child Advocate for Andrea and Leslie. Hernandez was appointed as guardian ad litem for the girls in 2016, and met

---

[2] A fourth child was born while this case was pending. That child is not a part of these proceedings.

with them once a month. The last time Hernandez saw the girls, they were the happiest she had seen them since the beginning of the case. Hernandez attributed this improvement to the consistency the girls enjoyed in their foster home. The foster mother made sure the girls received the weekly counseling and speech therapy they needed.

The girls attended school in a "very nice school district" and the foster mother maintained contact with the school administrators and teachers. Andrea also received "reading intervention" during the school day and tutorials after school. Andrea repeated kindergarten and at the time of trial was in first grade. Hernandez spoke with Andrea's teachers who said she was doing well. Andrea tended to get into arguments but the teachers reported that is not atypical of children Andrea's age. Leslie was in pre-kindergarten and was performing appropriately. Leslie showed some aggression on the bus riding to and from school but no aggression in the classroom. Leslie struggled with maintaining attentiveness in the classroom and has since been diagnosed with Attention Deficit Hyperactivity Disorder. Leslie is not old enough to take medication for ADHD but the foster mother is using other tools to help her cope.

Hernandez believed termination of Mother's parental rights was in the girls' best interest because they have had a "very inconsistent lifestyle in regards to caregivers." When the girls were transferred from their last foster mother to the foster mother they were living with at the time of trial Andrea developed severe anxiety, which manifested in physical symptoms including vomiting. Hernandez believed that consistency was extremely important to the girls' emotional and psychological development.

Edwards, the caseworker, agreed with Noser and Hernandez about the progress of the children while in foster care. In Edwards' permanency report she

noted that when the girls came into foster care they experienced some difficulties and adverse behaviors. Specifically, Andrea told her therapist that she wanted to harm her sister. Andrea's caregiver in late 2017 had seen Andrea placing objects, including her fingers, down her throat causing her to vomit, bleed in her throat, and experience infections. Also late in 2017, Leslie, who was four years old at the time, exhibited difficulty in performing certain tasks independently including dressing herself and going to the restroom without assistance.

The foster home is a very supportive environment conducive to the children's needs, including their emotional needs in addition to basic needs of the ability to attend school regularly, go to church, and go on outings and trips. Edwards also believed adoption was in the children's best interest to permit them to be in a stable home.

**ANALYSIS**

In two issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding of endangerment under section 161.001(b)(1)(D) and the factual sufficiency of the evidence to support the best-interest finding.

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## I.      Endangerment Finding

In her first issue Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding of endangerment under section 161.001(b)(1)(D). Mother's parental rights to Andrea were terminated on the predicate grounds of endangerment under section 161.001(b)(1)(D) and (E). Mother's rights to Leslie and Barry were terminated on endangerment grounds and grounds that she was the cause of the children being born addicted to alcohol or a controlled substance. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), & (R). On appeal Mother only challenges the trial court's findings under section

13

161.001(b)(1)(D).

"Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Mother has not challenged all possible grounds supporting the trial court's judgment. Because Mother has not challenged the trial court's findings under subsections E and R, we must overrule Mother's challenge to the legal and factual sufficiency of the evidence to support the trial court's finding under subsection D. *See Fletcher v. Dep't of Family & Protective Services*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (when an appellant does not challenge an independent ground that may support the judgment that appellant seeks to reverse, this court must overrule the challenges that the appellant has chosen to assert). We overrule Mother's first issue.

## II.    Best Interest of the Children

In her second issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children.

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367,

14

371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also* Tex. Fam. Code Ann. § 263.307(b) (West Supp. 2017) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the children is served by keeping the children with their natural parents, and the burden is on the Department to rebut that presumption. *In re U.P.*, 105 S.W.3d at 230. Prompt and permanent placement in a safe environment also is presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a).

## A.     Desires of the children

At the time of trial Andrea was seven years old, Leslie was four years old, and Barry was 18 months old. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Mother argues there is no evidence about the children's desires. The record reflects, however, that the oldest child is seven, and that all three children live in the same foster home with Mother's youngest child who was removed at birth. The foster home was stable and was described by the caseworker as Andrea's and Leslie's best chance to have "a normal childhood." Barry was born with symptoms of drug withdrawal, which have abated since his time in the foster home. The foster home is the only home Barry has known and he seemed happy and well-adjusted.

## B.     Present and future physical and emotional needs of the children and present and future physical and emotional danger to the children

Mother acknowledges that Barry was described by Noser, the Child Advocate,

as a "normal, happy baby" with no special needs. Noser further testified that Barry came into care with special needs and required extra medical attention due to drug withdrawal. Noser testified that the foster mother was capable of meeting all of Barry's physical and emotional needs. Leslie needed speech therapy twice a week and Andrea was receiving reading intervention and tutorials after school. Both Child Advocates and the Department caseworker believed that the foster mother was capable of meeting all the children's physical and emotional needs.

Mother argues, however, that the only competent evidence suggesting that she could not meet the children's needs was the caseworker's testimony. Mother argues that the Advocates' testimony was conclusory. On review of the factual sufficiency of the trial court's best-interest finding, we must give due deference to the trial court's fact-finding role by resolving disputed evidence in favor of the finding if a reasonable person could have found it to be clear and convincing. *See In re J.F.C.*, 96 S.W.3d at 266. The caseworker's testimony along with that of the Child Advocates and the psychologist that Mother could not meet the children's physical and emotional needs is sufficient to support the trial court's best-interest finding. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future.).

Mother further argues that she has taken significant steps toward addressing her drug abuse by participating in residential treatment and intensive outpatient programs. Mother has begun taking medication to address other mental health issues. Despite opportunities to relapse Mother has maintained sobriety for nine months.

To be sure, Mother has made progress toward her own sobriety. "[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude

16

that rehabilitation, once begun, will surely continue." *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A factfinder is "not required to ignore a long history of dependency and abusive behavior merely because it abates as trial approaches." *Id.* at 513.

In making its best-interest finding, the trial court reasonably could have credited the evidence of Mother's rehabilitation and decide that it justified returning the children, but we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *See id.* at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. *Id.*

### C. Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the children by the individual seeking custody

These factors compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Ross, the psychologist who conducted Mother's assessment, testified that Mother did not understand the children's emotional and physical needs. Mother did not understand the children's level of independence and was unable to balance this feeling with the feeling that she should have complete power over the children. Ross testified that Mother lacked knowledge of alternatives to corporal punishment and that Ross's findings were concerning because at the time Mother was assessed she had attended parenting classes.

In contrast, the foster mother was providing a consistent lifestyle for the children. The girls were attending school and were performing appropriately. The foster mother was working with Leslie to manage Leslie's ADHD until Leslie was

old enough to take medication. The foster mother cared for Barry while he recovered from symptoms of drug withdrawal. By the time of trial Barry was happy and well-adjusted in the only home he knew.

### D. Programs available to assist in promoting the children's best interest

Under this factor Mother argues that she has succeeded in availing herself of programs available to assist her with her substance abuse. Mother points out that the Star of Hope program will provide daycare assistance, work-study programs, and job training programs. The best interest analysis, however, focuses on the best interest of the child, not that of the parent. *In re C.V.*, 531 S.W.3d 301, 307 (Tex. App.—Amarillo 2017, pet. denied).

Although the record reflects that Mother completed most of the services in her service plan, it also demonstrates that even after taking the prescribed parenting classes, Mother did not demonstrate basic understanding of parenting skills to keep her children safe. Compliance with a family service plan does not render termination impossible or trump all other termination factors. *See In re M.G.D.*, 108 S.W.3d at 514. "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *Id.* The trial court could have held a firm conviction that, despite Mother's compliance with the family service plan, her endangering conduct was likely to continue.

### E. Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions

Mother admits she did not initiate services or substance abuse treatment until over one year after her children were removed. Mother blames the Department for her inability to visit her children for two years. The record reflects the trial court ordered that Mother was not permitted to visit her children until she tested negative

for drugs. Mother had control over whether she would be allowed to visit her children.

Mother's pattern of conduct reflects that termination is in the best interest of the children. In view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. We overrule Mother's second issue.

CONCLUSION

Because Mother failed to challenge the predicate grounds for termination under section 161.001(b)(1)(E) & (R), the trial court's findings under those sections suffice to sustain the predicate grounds for termination of Mother's parental rights. And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interest so that they could promptly achieve permanency through adoption. *See In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

We affirm the decree terminating Mother's parental rights.

/s/     William J. Boyce
       Justice

Panel consists of Justices Boyce, Christopher, and Jewell.