**Opinion issued March 20, 2026**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-25-00779-CV**

————————————

## IN THE INTEREST OF K.K.E., A CHILD

———

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2023-01661J**

———

## MEMORANDUM OPINION

After a bench trial, the trial court signed an order terminating the parental rights of L.B. ("Mother") to her child "Kevin."[1]  Mother challenges the legal and

---

[1]   We refer to appellant by her initials or as Mother, to the child by an alias, and to other individuals by their relationships to the child or Mother.  *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).  We note the parental rights of the child's father were also terminated, but he has not appealed.

factual sufficiency of the evidence supporting the trial court's findings of statutory grounds for termination and that termination was in Kevin's best interest. Mother also challenges the admission at trial of the removal affidavit the Department of Family and Protective Services completed when it petitioned to terminate her parental rights. We affirm.

## Background

Mother has five children, all of whom have been involved with the Department and none of whom are in Mother's care. The two older children are in the managing conservatorship of their maternal grandparents. Mother's parental rights to the two middle children were previously terminated. And the youngest child, Kevin, is the subject of this action.

Kevin was born on January 21, 2023, and five months after his birth, the Department received a referral alleging that Mother was not appropriately caring for him because she was abusing prescription medications and possibly other drugs. Two weeks later, the Department received a second referral alleging that Mother was talking with a friend on FaceTime and began "foaming at the mouth." The friend—aware that Mother had Kevin in her care—called 911. When police arrived, Mother was in "an altered state," which the Department's removal affidavit attributed to "alcohol, or drugs, or acute illness" and a caseworker later called an overdose. Mother was transported to the hospital, and Kevin went with her.

2

The Department filed suit for protection of Kevin, seeking conservatorship and termination of Mother's parental rights. A bench trial was held over the course of ten days between June 2024 and August 2025.[2] Two caseworkers, both parents, a foster parent, and the maternal grandfather testified.

As described by one of the caseworkers, the Department's case was not focused on physical harm to Kevin—he entered the Department's care in good health. Instead, the Department was concerned that Mother's mental health and management (or mismanagement) of medication prevented her from safely parenting Kevin. The Department also had concern for Mother's past criminal activity and history of entering violent relationships.

## A. Mother's history with the Department and the criminal justice system

Mother's prior history with the Department was one source of concern. As detailed in the removal affidavit, Mother's involvement with the Department includes more than a decade of allegations related to drug and alcohol use affecting the care of her children. In 2011, the Department became involved with Mother's oldest child after receiving a report that domestic violence was occurring in the home, that Mother had driven while intoxicated with the oldest child in the car, that she left her parents to care for the child because she slept until late in the afternoon,

---

[2] Progress of the trial was slowed at times by scheduling conflicts and at other times because Mother was unavailable to attend because of hospitalization.

and that she could not pay rent or ask family for help doing so because she had used money given to her in the past for drugs and alcohol. The removal affidavit also notes that Mother was believed to have used marijuana during her pregnancy with her first child, and that her second child tested positive for marijuana at birth.

Referrals related to drugs and alcohol continued in 2016, when the Department received a report that Mother committed family violence. The removal affidavit states that the two older children were living with their maternal grandparents when Mother, who had been drinking and using illegal drugs in the home, started a fight "over the children brushing their teeth," pushed the maternal grandmother, threw hot water on the maternal grandmother, and retrieved a knife from the kitchen which she ultimately did not use. A protective order in favor of the maternal grandmother was entered against Mother based on family violence.

Then, in 2018, the Department received a referral related to Mother's third child. The report alleged that the child was not thriving or gaining weight because Mother was not providing formula. Although an investigator determined the child was healthy and meeting milestones, the removal affidavit noted a potential addiction to pain medication and that Mother had prescription bottles for and was taking Prozac, OxyContin, Xanax, fluoxetine, hydrocodone, tramadol, and gabapentin.

Less than a year later, the Department received another referral for neglectful supervision of the third child. Mother had left the child with a grandparent, and Mother's location was unknown. The removal affidavit noted that domestic violence was being perpetrated against Mother in her relationship, that she suffered from bipolar disorder, anxiety, and Post-Traumatic Stress Disorder, and that she was addicted to pain medication. Once located, Mother appeared "erratic" and "at times incoherent." She was hospitalized and tested positive for marijuana, benzodiazepines, and alcohol.

The Department eventually removed the third and fourth children and succeeded in terminating Mother's parental rights as to them. One basis for the termination was a finding that Mother had "used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the children, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance."[3]

Beyond this history of the Department's involvement, the removal affidavit detailed Mother's criminal history as including twenty charges between 2005 and

---

[3] The other basis for termination was Mother's failure to comply with the court-ordered family service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(O). Our sibling court in Houston affirmed the termination of Mother's parental rights to the middle children. *See In re J.J.B.*, No. 14-22-00644-CV, 2023 WL 142406, at *1 (Tex. App.—Houston [14th Dist.] Jan. 10, 2023, no pet.) (mem. op.).

2020 for a variety of offenses such as theft, driving while intoxicated, criminal mischief, harassment of a public servant, assault family violence, and assault bodily injury. There is little evidence about the disposition of most of these charges, but the Department presented judgments showing Mother was convicted of assault family violence in 2013, theft and criminal mischief in 2014, and assault bodily injury in 2017.

## B.  This termination proceeding

To address the Department's concerns about Mother's mental health, prescription drug use, criminal history, and violent relationships, the trial court approved a family service plan. The plan required Mother to visit Kevin regularly, maintain stable housing and employment for a minimum of six months, avoid criminal activity, complete a parenting course at an approved facility, complete a drug assessment and follow all recommendations, and submit to random drug testing. The plan also required Mother to undergo a psychiatric evaluation or, if she was already under the care of a psychiatrist, to sign a release of information so the Department could verify her treatment. Finally, Mother was required to complete a psychosocial evaluation and a domestic violence assessment and follow any recommendations.

Two caseworkers, C. Simmons and D. McFarland, testified about Mother's progress on the family service plan. When trial began in June 2024, Mother had not

6

made progress on several services and some of the progress she claimed to make could not be verified. For instance, Simmons testified that the paychecks Mother submitted in 2024 showed employment but conflicted with information she gave about salary, and the Department could not reach any supervisor to verify the employment. Likewise, although Mother had completed a psychiatric assessment and engaged with individual therapy, the Department needed documentation that Mother was attending appointments, about what medications she was prescribed, and the frequency at which she took the medication.

During the case, Mother exhibited some behaviors that caused the Department to be concerned she was abusing prescription medications or other drugs. She sometimes lost track of a thought mid-sentence, appeared to be confused or "kind of dazed," and sometimes spoke with thick or slurred speech. Additionally, she was not consistent about drug testing and did not submit to any drug tests between August 30, 2024, and July 29, 2025. The drug tests she did submit to were positive for a combination of combination of nordiazepam, oxazepam, temazepam, alprazolam metabolite, codeine, morphine, and hydromorphone.[4] While Mother provided the Department with some records of her prescriptions, she did not keep the records

---

[4] Mother also tested positive regularly for marijuana and once for methamphetamine. As to the marijuana, Mother offered a prescription for compassionate use into the evidence at trial. She attributed the positive methamphetamine result to an inadvertent exposure while she was sharing an Airbnb with someone using the drug.

updated, so the Department could not confirm whether the drugs she tested positive for were prescribed medical uses.

Other witnesses shared the Department's concern for Mother's drug use. Kevin's biological Father believed Mother had a "drinking problem and a drug problem" and could not safely parent Kevin. He testified that Mother took "many" prescription drugs and had up to twenty prescription bottles in a bag, including when she was pregnant with Kevin. He further testified that Mother's behavior sometimes changed when she took the medications. She seemed sleepy, confused, and like she was "not thinking straight."

Mother denied that Father was a credible witness and that she was addicted to pain medications or any other drugs.[5] She claimed that she used medications as prescribed to manage several medical conditions. Specifically, she testified that, during trial, she had given birth to a stillborn child during trial and needed pain medication for cramping. And she testified that she needed pain medication to manage gastroparesis and injuries she sustained in a fire in 2015 and when she was struck by a car about three years before trial.

---

[5] Mother claimed that Kevin was conceived when Father sexually assaulted her. When Kevin entered the Department's care, Father was in jail on a charge that he assaulted Mother before Kevin was born. Father ultimately pleaded guilty to the charge and was placed on deferred-adjudication community supervision. At the time of trial, he and Mother no longer had a relationship.

The substance abuse assessment that Mother completed recommended that she detox and attend inpatient therapy. Although she disagreed with the recommendation and expressed concern for experiencing pain if she stopped taking medication, Mother participated in a residential treatment program at a facility called Cenikor to which the Department was not connected. Mother claimed that she completed a twenty-one-day program, and she presented a "Certificate of Participation" stating that she "successfully participated in the Intense Residential Program" and certifying her "completion of the course." When the Department requested more information about the program, a Cenikor clinician wrote a letter that Mother had "participated in" the residential program for ten days before being discharged to a nearby medical facility. Caseworker McFarland had no evidence that Mother engaged in aftercare once she was discharged.

The Department also pointed to evidence that Mother missed visits with Kevin, often canceling the day of a visit or no-showing. Mother did not visit Kevin in November 2024, January 2025, February 2025, or March 2025. She regularly started visiting Kevin only during trial, in April 2025. Between April 2025 and the end of July 2025, Mother attended five visits and missed two.

Both Simmons and McFarland testified that the visits Mother attended were generally appropriate, with McFarland observing that Mother was attentive, brought snacks, and played with Kevin. However, Simmons recalled that Kevin sometimes

9

struggled after visits and, once, appeared uninterested when he went to the door and asked to leave. Simmons never saw Mother take medication at visits, but in her view, Mother sometimes appeared high, ill, or both. Simmons acknowledged that Mother did not appear to be under the influence at more recent visits during trial and that she never engaged in behavior that would cause the visits to stop.

Mother stated that she missed some visits with Kevin because she was at Cenikor for drug treatment or was hospitalized. Mother claimed that hospitalizations had also disrupted her progress on domestic violence and parenting classes, though she eventually completed the parenting classes and had taken some domestic violence classes.[6] Mother presented hospital records showing stays at one hospital on several occasions between July 2023 and August 2024, including July 8–10, 2023; July 14, 2023; August 2–3, 2023; September 21–29, 2023; January 17–18, 2024; January 19–26, 2024; May 20, 2024; July 10–15, 2024; July 18–23, 2024; July 30–August 2, 2024; August 5, 2024; and August 9, 2024. Although Mother claimed she received additional care at other facilities, she did not offer records of that care.

The Department acknowledged Mother was hospitalized at times during the case but pointed out that the records did not show long hospital stays that would

---

[6]     The Department questioned whether Mother had satisfactorily completed parenting classes because she provided only a screenshot purporting to show completion rather than an official certificate. The Department had no information about what the parenting classes involved because they were through an unknown provider.

explain missing whole months of visitation or not staying in touch with the Department. McFarland described Mother's hospital stays as frequent but not long. And Simmons testified there were several times during the case when Mother was not hospitalized and could have made progress on services.

The Department also pointed out that Mother's hospital records included provider notes suggesting that Mother had opioid and benzodiazepine dependencies, was using drugs that were not indicated, had requested opiates when they were not medically necessary, and became violent when pain medication was not provided. Other records included notes of concern for Mother's "suspicious and unclear" medical history and "pain-med seeking" or "opiate-seeking" behaviors.

Simmons testified that termination of parental rights was in Kevin's best interest. She explained that Kevin had been in the same adoptive foster home since he entered care in 2023, where he is bonded with his foster parents, is doing well, and is meeting milestones.

Although Mother acknowledged that Kevin was being well cared for by his foster family, she testified that she wanted to be reunited with him and her other children despite obstacles like her parents' conservatorship of the older children and the termination of her parental rights to the middle children. Mother believed she could care for Kevin because she had lived in the same apartment since February 2024 and was employed with a credit repair agency that allowed her to work from

home. If she could not care for Kevin during work hours, Mother planned to find a daycare or ask a friend to watch Kevin. Mother testified that she has the support of her father, who has allowed her unsupervised visits with the older children.

However, the maternal grandfather's testimony contradicted Mother on visits with the older children. He testified that while Mother visits the older children at his discretion and can be a positive influence, the visits are still supervised by him and his wife. He had observed positive improvements from Mother and believed she could care for Kevin if her health issues resolved. He was willing to help Mother and paid her rent. He admitted that he did not know if or where Mother worked. He also did not know that Mother received treatment at Cenikor and did not believe she had any substance abuse issues. He believed Mother took her medication appropriately.

The trial court signed a final decree[7] terminating Mother's parental rights based on three statutory predicate grounds—Subsections (E) (engaging in endangering conduct), (O) (failing to comply with the court-ordered family service plan), and (P) (using a controlled substance in a manner that endangers the child)—

---

[7]     In the original decree, the Subsection (O) finding was errantly labeled as a Subsection (D) finding. The trial court corrected the error in an amended decree signed six days later.

and because termination was in Kevin's best interest.  *See* TEX. FAM. CODE §§ 161.001(b)(1)(E), (O)–(P), (b)(2).[8]  Mother now appeals.

## Sufficiency of the Evidence

Mother challenges the legal and factual sufficiency of the evidence supporting only two of those findings: the finding of endangering conduct under Subsection (E) and the finding of drug use in the manner prohibited by Subsection (P).[9]  She also

---

[8]    All references in this opinion to Section 161.001 are to the version of the statute in effect at the time of trial.  As of that date, Texas Family Code Section 161.001(b)(1)(O) provided a predicate ground for termination based on a failure to comply with a court-ordered family service plan.  The Texas Legislature removed this ground effective September 1, 2025, and renumbered subsequent grounds accordingly.  *See* Act of May 14, 2025, 89th Leg., R.S., ch. 211, § 2, 2025 Tex. Sess. Law Serv. 573, 574–75 (codified at TEX. FAM. CODE § 161.001).  The amendments apply to termination suits "pending in a trial court" on the effective date or "filed on or after" the effective date.  *Id.* § 3.  Here, the original decree terminating Mother's parental rights was signed on August 27, 2025, and the corrected decree was signed on September 3, 2025.  We need not decide whether the correction of the termination decree after the September 1 effective date subjects this case to the amendments repealing Subsection (O) because, for reasons explained below, we affirm the predicate finding under Subsection (E), which is unchanged by the amendments.

[9]    Mother does not challenge the trial court's finding under Subsection (O).  Ordinarily that would end our analysis of the predicate grounds because only one predicate finding is required, and an unchallenged finding is binding.  *See In re M.P.*, 639 S.W.3d 700, 702 (Tex. 2022) (per curiam); *In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).  But when, as here, termination is ordered under the predicate ground in Subsection (E), we must review that ground because it has special significance and can supply the basis for future terminations. *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (due process mandates appellate review of Subsection (D) and (E) findings even if court affirms on another ground because of collateral consequences); *see also* TEX. FAM. CODE § 161.001(b)(M).

13

argues that the Department did not present legally and factually sufficient evidence that termination of her parental rights was in Kevin's best interest.

## A.   Standard of review and applicable law

To terminate a parent's rights to her minor child, the factfinder must find by clear and convincing evidence that (1) at least one statutory predicate ground for termination exists, and (2) termination of parental rights is in the best interest of the child. *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024) (per curiam); *see also* TEX. FAM. CODE § 161.001(b).  Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE § 101.007.

Because of the elevated burden of proof in a termination case, we do not apply the traditional formulations of legal and factual sufficiency on appeal.  *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).  In a legal-sufficiency review of termination findings, we consider all the evidence in a light favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction about the truth of the Department's allegations.  *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024); *In re C.E.*, 687 S.W.3d at 308.  The factfinder resolves conflicts in the testimony, weighs evidence, and draws reasonable inferences from the evidence that it chooses to believe.  *In re C.E.*, 687 S.W.3d at 308–09; *see In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (factfinder is "sole arbiter of the witnesses' credibility

14

and demeanor," and therefore we must defer to factfinder's factual determinations). We must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, but we should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re C.E.*, 687 S.W.3d at 308. We may not substitute our judgment for that of the factfinder. *Id.* at 309.

In a factual-sufficiency review of termination findings, we weigh disputed evidence contrary to a finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631. The evidence is factually insufficient if, in view of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that the factfinder could not have formed a firm belief or conviction that the Department's allegations were true. *Id.*

## B. Subsection (E) endangerment finding

A parent's rights may be terminated under Subsection (E) when the court finds by clear and convincing evidence that the parent has engaged in conduct "which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). To "endanger" in this context means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a

15

less-than-ideal family environment," but a parent's conduct can be endangering even if it is not directed at the child and the child does not suffer injury. *In re R.R.A.*, 687 S.W.3d at 277.

Termination under Subsection (E) must rest on more than a single act or omission; instead, this subsection requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re R.R.*, 711 S.W.3d 126, 139 (Tex. App.— Houston [1st Dist.] 2024, no pet.). We may consider the parent's actions before the child's birth "while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). And we may consider conduct that occurred after the Department removed the child from the parent's care. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

"[A] pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *In re R.R.A.*, 687 S.W.3d at 278. This behavior can include substance abuse and its effect on a parent's life and ability to parent. *In re J.O.A.*, 283 S.W.3d at 345. "It also can be appropriate to consider the use of multiple prescription drugs." *In re A.J.E.M.-B.*, Nos. 14-14-00424-CV, 14-14-00444-CV, 2014 WL 5795484, at *4 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.); *see In re T.D.L.*, No. 02-05-00250-CV, 2006 WL 302126, at *7–8 (Tex. App.—Fort Worth Feb. 9, 2006,

no pet.) (mem. op.) (considering continuous abuse of prescription drugs in concluding evidence supported trial court's Subsection (E) finding).

Here, the Department presented evidence that supported the trial court's finding that Mother engaged in conduct that endangered Kevin's well-being. Mother's prior history with the Department demonstrated that her parenting of Kevin's older siblings was impacted by drug use. The removal affidavit that the Department completed when it petitioned to terminate Mother's parental rights is replete with allegations of instability resulting, at least in part, from abuse of alcohol, marijuana, prescription drugs, and other illegal substances going back to 2011, and includes a specific allegation of addiction to pain medication in 2018.

Less than a year before the Department became involved with Kevin, Mother's parental rights to her third and fourth children were terminated. Drug use was one reason for the termination. The trial court found under Subsection (P) that Mother had used a controlled substance in a manner that endangered the children's health or safety, and (1) failed to complete a court-ordered substance-abuse treatment program, or (2) after completing the court-ordered substance-abuse treatment program, had continued to abuse the controlled substance. *See* TEX. FAM. CODE § 161.001(b)(1)(P). Additionally, there is evidence that another of Mother's children was taken to the emergency room after eating a marijuana "gummy," which the child claimed Mother gave her. Mother and the maternal grandfather testified

17

that the child later admitted the gummy came from someone else, but the trial court could have disbelieved their testimony about the child's recantation. *See In re J.F.-G.*, 627 S.W.3d at 312.

The Department presented evidence that Mother's drug use was ongoing. Caseworker Simmons testified that Kevin came to the Department's attention because of an allegation that Mother was not caring for him and abusing "various medications and possibly drugs." While the Department was investigating this allegation, the Department received a second referral alleging that Mother had overdosed in a hotel when Kevin, an infant, was with her. The removal affidavit described Mother as "foaming at the mouth" on a FaceTime call with a friend and "in an altered state" when police arrived to help.[10] Mother and Kevin were taken to the hospital together by ambulance.

Mother admitted to frequent use of prescription drugs, including pain medications. Throughout the suit, she tested positive for a combination of nordiazepam, oxazepam, temazepam, alprazolam metabolite, codeine, morphine, and hydromorphone. A copy of her pharmaceutical records shows that she received more than sixty-five prescriptions in six months between January 1, 2025, and June 30, 2025.

---

[10]    We note that the removal affidavit states that it was unknown at the time whether Mother's altered state "was related to alcohol, drugs, or acute illness," while Simmons testified that Mother overdosed at trial.

Father testified that Mother had a "drug problem" and that her behavior changed when she took medication; she became sleepy, confused, and did "not think[] straight." Caseworker Simmons also described Mother as seeming confused or having thick or slurred speech at times. Asked whether Mother ever appeared to be not "all there" on visits with Kevin, Simmons answered affirmatively and explained that Mother sometimes appeared sick, "high," or both and claimed that "she had taken her medication for whatever was going on." Simmons acknowledged, however, that she never saw Mother take medication during visits with Kevin or engage in behavior that would require the Department to stop visits.

Mother denied abusing any drugs and testified that she took medication as prescribed by doctors for serious health conditions like gastroparesis and chronic pain from a previous burn injury and car accident. At least some evidence supports that Mother has needed multiple surgeries in the past and was hospitalized several times while Kevin was in the Department's care. But the record also contains evidence that Mother has used prescription medication inappropriately.

The records of Mother's hospital visits include notes identifying opioid and benzodiazepine dependencies, attributing some of Mother's gastrointestinal symptoms to those dependencies, and warning Mother was at risk of withdrawal. The records reflect that Mother requested opiates when they were not medically necessary, that she was taking both Xanax and Valium, even though there was no

19

indication for both medications, and that she became violent when denied pain medication. During one hospital stay in August 2023, a nurse informed Mother that she could not have additional pain medication, provoking Mother to yell obscenities and throw the call light at the nurse. The next month, in September 2023, healthcare providers expressed concern that Mother's medical history was "suspicious and unclear," and in July 2024, noted "pain-med seeking" or "opiate-seeking" behaviors. Still, another note reflected that Mother had sought treatment at three hospitals for the same condition in a single day yet did not meet admission criteria because her vital signs were normal and stable.

And the evidence was not limited to prescription drugs. Mother also tested positive for marijuana eight times, though she presented a prescription for compassionate use of the drug at trial which predated the positive test results. She also tested positive for methamphetamine once in February 2024. As to the methamphetamine, Mother claimed that she was inadvertently exposed while sharing an Airbnb; but again, the trial court was free to find that explanation not credible. *See In re J.F.-G.*, 627 S.W.3d at 312. Notably, Mother did not submit to any drug testing for nearly one year between August 30, 2024, and July 29, 2025. Each missed test was equivalent to a positive test result and evidence of ongoing drug use. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.); *In re K.C.F.*, No.

20

01-13-01078-CV, 2014 WL 2538624, at *10 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (mem. op.) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."). While it is possible that Mother missed *some* tests because of illness or hospitalization, the trial court could reasonably find that not *all* missed tests were excused. *See In re J.F.-G.*, 627 S.W.3d at 312.

The evidence of prescription and other drug abuse, combined with evidence that Mother did not complete the parts of the family service plan designed to address drug abuse, supports the trial court's finding of endangerment. *See In re A.S.D.*, No. 14-24-00909-CV, 2025 WL 1375194, at *7 (Tex. App.—Houston [14th Dist.] May 13, 2025, pet. denied) (mem. op.) (parent's failure to comply with service plan designed to enhance their parenting skills and prevent harm to child can be considered in Subsection (E) endangerment analysis); *In re S.R.*, 452 S.W.3d at 362 (same). In addition to the random drug testing already discussed, the family service plan required Mother to follow the recommendation from her substance-abuse assessment for inpatient treatment. There was evidence Mother received inpatient treatment at Cenikor, but it is unclear whether she completed the treatment program, and the trial court could reasonably conclude she did not. *See In re J.F.-G.*, 627 S.W.3d at 312.

Mother provided the Department with a "Certificate of Participation" which stated that she had "successfully participated in the Intense Residential Program" and included a clinician's statement approving Mother's "completion of the course." In response to the Department's request for more information about the course, the clinician answered by letter that Mother had "participated in" the residential program for ten days "in an attempt to overcome moderate f1320 sedative, hypnotic use disorder," and during that time, she had "engaged in activities that taught her how to deal with substance abuse." But Mother was ultimately discharged after ten days because she was admitted to a nearby medical facility. Contrary to the clinician's statements about the length of her participation, Mother testified that Cenikor's program was for twenty-one days and that she stayed for the duration.

The evidence of Mother's assaultive or threatening conduct and criminal history also supports the trial court's endangerment finding. *See In re J.F.-G.*, 627 S.W.3d at 313 ("A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment."); *see also In re N.J.H.*, 575 S.W.3d 822, 832–33 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (evidence parent has engaged in abusive and violent criminal conduct in past permits inference that parent will continue violent behavior in future). Mother was convicted of family violence in 2013, was the subject of a protective order obtained by the

22

maternal grandmother based on family violence in 2016, and was convicted of assault bodily injury in 2017.[11]

Mother contends these convictions and the protective order are too stale to be relevant to the endangerment analysis, but other evidence showed a continuing pattern of violent outbursts and threatening conduct while the termination case was pending. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (want of self-control and propensity for violence may be considered evidence of endangerment). As already discussed, Mother threw a call light at a nurse who denied pain medication. When the Department attempted to interview Mother in the hospital after receiving the second referral, she became aggressive. When the Department later took possession of Kevin, Mother went to the Department's office, became loud, caused staff members to retreat to an area of the office that was locked, and then banged on locked door. When security intervened, Mother threatened the guard. Mother refused to leave the building and had to be escorted out by two constables. Not long after, Mother called the Department's investigator and threatened to go to his house and his supervisor's house. And Mother admitted she photographed the foster family's license plate during visitation so that she could locate their home.

---

[11] The Department's evidence showed additional convictions for criminal mischief and theft.

23

Considering all the evidence, including the disputed evidence that a reasonable factfinder could not have credited in favor of its termination finding under Subsection (E), we conclude that the trial court reasonably could have formed a firm belief or conviction that Mother engaged in a course of endangering conduct. We hold that legally and factually sufficient evidence supports the trial court's endangerment finding under Subsection (E).

We overrule that part of Mother's first issue challenging the Subsection (E) finding.[12]

## A. Best-interest finding

We turn to Mother's third issue challenging the trial court's finding that termination of her parental rights is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). No specific set of facts is required to establish that termination is in the best interest of a child, but there are several nonexclusive factors that may guide the factfinder's best-interest determination. *See In re L.M.*, 572 S.W.3d 823, 827 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also In re A.C.*, 560 S.W.3d at 631 (best-interest inquiry is "child-centered and focuses on the child's well-being, safety, and development"). These factors include:

- the desires of the child;

- the child's physical and emotional needs now and in the future;

---

[12] We do not address Mother's Subsection (P) challenge because only one predicate finding is required. *See In re A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1.

24

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist the people seeking custody in promoting the best interest of the child;

- the plans for the child by the individuals or the agency seeking custody;

- the stability of the home or proposed placement;

- the acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* TEX. FAM. CODE § 263.307(b) (listing additional factors to consider in evaluating a parent's willingness and ability to provide the child with a safe environment). Evidence supporting termination under one of the predicate grounds can also be considered in support of a finding that termination is in the child's best interest. *See In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Mother contends that no rational factfinder could have formed a strong conviction or belief that severing the parent-child relationship was in Kevin's best interest. But several factors support the trial court's finding.

While there is no direct evidence about Kevin's desire because he was not yet three years old when the trial ended, the trial court could consider that Kevin has bonded with his foster parents, is well-cared for by them, and has spent minimal time

with Mother. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Mother attended visits with Kevin more regularly toward the end of trial, but before then, she missed several visits, including for multiple months at a time, and often cancelled with little or no notice. McFarland and Simmons described Mother as attentive and mostly appropriate during visits, but the trial court also heard concerns from Simmons that Mother was not "all there" at times and that Kevin was irritable after visits and, on one occasion, wished to leave the room.

Kevin does not have any special needs and was described as "an amazing kid," "very intelligent," and "very astute." There was no dispute that his current foster placement was meeting his emotional and physical needs and desired to continue doing so through adoption. No witness, including Mother, expressed concern for the foster family's ability to provide Kevin with a stable, safe, and nurturing environment now and in the future.

In contrast, the evidence provided the trial court with a basis for doubting whether Mother could safely parent Kevin. Kevin was healthy when he entered the Department's care, and Mother testified that she has an appropriate apartment, a steady job, and family support that will allow her to safely parent Kevin. But as we have already discussed, Mother had a lengthy history with the Department and did not have custody of any of her children at trial. Considering that history and the

26

Department's other evidence that Mother was confused, drowsy, and unable to understand conversations, that another child had obtained a marijuana gummy from Mother, that Mother delayed in pursuing services, and that medical providers were skeptical of her medical history and behavior around obtaining pain medications, the trial court could reasonably believe that Mother had an unaddressed addiction to pain or other prescription medications that would interfere with her ability to keep Kevin safe at his tender age.

The trial court, as factfinder, also may have considered Mother's pattern of assaultive or violent behavior in evaluating her ability to provide Kevin with a safe home. *See, e.g.*, *In re C.J.*, Nos. 14-07-00838-CV, 14-07-00839-CV, 2008 WL 4447687, at *5 (Tex. App.—Houston [14th Dist.] July 10, 2008, no pet.) (mem. op.) (evidence of "parent's past behavior is indicative of the quality of future care that the parent is capable of providing" and relevant to best-interest determination); *In re J.I.T.P.*, 99 S.W.3d at 845 (abusive or violent conduct can produce home environment that endangers child's well-being). The Department presented evidence that Mother threw an object at a nurse who denied her pain medication, had twice been convicted for violent or assault-based crimes, and was the subject of a protective order based on family violence.

Mother's performance under the family service plan is also relevant. *See Holley*, 544 S.W.2d at 371–72; *see also In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex.

2013). The Department acknowledged Mother made progress on her family service plan and completed several items, which is commendable. But the trial court could consider that much of her progress was made during trial and nearly two years after Kevin entered the Department's care. *See In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[W]e believe a parent's recent turnaround and compliance with a family service plan are factors jurors should consider, but not determinative ones. If the facts involved show progress may take a very long time . . . reasonable jurors may conclude that termination is clearly and convincingly in the child's best interest.").

Additionally, there was conflicting evidence on the extent of Mother's progress. While there was evidence that Mother completed the assessments required by the family service plan, the evidence that she followed the recommendations from those assessments was disputed. Mother testified that she completed a twenty-one-day program for substance abuse at Cenikor, but the Cenikor clinician reported that Mother participated for only ten days before she was discharged for medical care. Mother testified that she is trusted with unsupervised visits with her older children in the maternal grandparents' care, but the maternal grandfather testified that they had not yet reached that level of trust. And Mother testified that she was employed, but the maternal grandfather testified she was not working and

28

that he was paying her rent. The trial court could have reasonably found Mother's self-serving explanations were not credible. *See In re J.F.-G.*, 627 S.W.3d at 312.

The same is true for Mother's hospitalizations. While there was little dispute at trial that Mother was hospitalized at times during the case, the trial court considered the records and the caseworkers' testimony that the hospital stays were frequent but not long enough to explain Mother's inattentiveness to the family service plan and visits with Kevin.

Giving due consideration to this evidence and the relevant factors, the trial court reasonably could have formed a firm belief or conviction about the truth of its findings that termination of Mother's parental rights was in Kevin's best interest. That is, viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis, and viewing all the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in Kevin's best interest.

We overrule Mother's third issue.

## Admissibility of Evidence

Within her first issue challenging the sufficiency of the evidence to support the trial court's Subsection (E) finding, Mother argues the trial court erred by

29

admitting the Department's removal affidavit into evidence at trial over her hearsay objection. Mother's complaint is not preserved.

The removal affidavit is fourteen pages long. Other than asserting generally that the removal affidavit contained hearsay and triple hearsay, Mother did not inform the trial court of the particular instances of hearsay she deemed inadmissible. "A blanket hearsay objection that does not identify which parts of a document contain hearsay is not sufficiently specific to preserve error with respect to those parts."[13] *L.M. v. Dep't of Family & Protective Servs.*, No. 01-11-00137-CV, 2012 WL 2923132, at *5 (Tex. App.—Houston [1st Dist.] July 12, 2012, pet. denied) (mem. op.); *see also In re C.C.*, 476 S.W.3d 632, 635–36 (Tex. App.—Amarillo 2015, no pet.) (objection that Department's investigative report was "littered with hearsay" did not preserve error for appeal).

We overrule that part of Mother's first issue challenging the admissibility of the removal affidavit.

---

[13] Even if Mother's hearsay objection had preserved error, it was properly denied because at least some parts of the removal affidavit were admissible, including the portions of the affidavit providing background information about the Department's involvement in the case, the affiant's actions to investigate the allegations against Mother, and his personal observations. *See L.M.*, 2012 WL 2923132, at *5 ("[A] general objection to evidence as a whole, which does not point out specifically the objectionable portion, is properly overruled if any part of that evidence is admissible.").

**Conclusion**

Having overruled the issues that are necessary to resolve Mother's appeal, we affirm the trial court's judgment terminating her parental rights.


Andrew Johnson
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.